UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

        -against-

MATTHEW ELIAS and LATIFF THOMPSON,

        Defendants.

MEMORANDUM & ORDER

18-CR-33 (S-2) (NGG)

NICHOLAS G. GARAUFIS, United States District Judge.

To facilitate the safe administration of in-person proceedings, the court has proposed excluding individuals who are not fully vaccinated against COVID-19 from the jury venire for the upcoming trial of Defendants Matthew Elias and Latiff Thompson. Defendants object to this proposal. For the reasons explained below, Defendants' objections are overruled.[1]

## I. BACKGROUND

The COVID-19 pandemic has reshaped New York City for nearly two years. The recent spread of new, highly transmissible mutations of the virus—the Delta and Omicron variants—has led to increased rates of infection and hospitalization,[2] and it has made the implementation of stricter safety protocols a day-to-day necessity.[3] Unlike during the pandemic's first year, vaccinations

---

[1] For the reasons explained herein, and unless otherwise stated, the court adopts this policy for all of its upcoming criminal and civil jury trials. The court will reconsider this policy if warranted by changing circumstances of the pandemic.

[2] Potential Rapid Increase of Omicron Variant Infections in the United States, Ctrs. for Disease Control and Prevention (Dec. 20, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/mathematical-modeling-outbreak.html (last visited Jan. 12, 2022).

[3] *See, e.g.*, Health and Safety Protocols for Courthouses in the Eastern District of New York (effective May 27, 2021) https://img.nyed.uscourts.gov

against COVID-19 are now widely available,[4] and, at the time of publication, more than 80% of adult New Yorkers have been fully inoculated against the virus.[5] The Centers for Disease Control and Prevention (the "CDC") encourages individuals to get fully vaccinated[6] and reports that vaccinations "protect people from

---

/files/pub-news/EDNY%20Health%20and%20Safety%20Protocols.pdf (last visited Jan. 12, 2022).

[4] *See, e.g.,* COVID-19: Vaccine, N.Y.C. Health Dep't, https://www1.nyc.gov/site/doh/covid/covid-19-vaccines.page (last visited Jan. 12, 2022).

[5] New York City reports that that 84% of adult residents have been fully vaccinated, and that 93.6% of adult residents have received at least one dose of a vaccine. *See* Vaccines, N.Y.C. Health Dep't, https://www1.nyc.gov/site/doh/covid/covid-19-data-vaccines.page#people (last visited Jan. 12, 2022).

[6] The court adopts the Centers for Disease Control and Prevention's definition of "fully vaccinated," which provides:

> Everyone 5 years and older is recommended to receive a primary series of a COVID-19 vaccine to be considered fully vaccinated.
>
> For persons 18 and older, a primary series consists of:
>
> > A 2-dose series of an mRNA COVID-19 vaccine (Pfizer-BioNTech or Moderna), or
> >
> > A single-dose COVID-19 vaccine (Johnson & Johnson's Janssen vaccine)
>
> Pfizer-BioNTech or Moderna (COVID-19 mRNA vaccines) are preferred. You may get Johnson & Johnson's Janssen COVID-19 vaccine in some situations.

Stay Up to Date with Your Vaccines, Ctrs. for Disease Control and Prevention (Jan. 5, 2022), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html (last visited Jan. 12, 2022). The court incorporates by reference any future CDC updates to its definition of "fully vaccinated."

2

COVID-19, slow transmission, and reduce the likelihood of new variants emerging."[7]

Within the legal system, the ongoing surge in Delta and Omicron transmission has exacerbated the logistical challenges that the pandemic has introduced. Many civil proceedings, and some criminal ones, are being conducted adequately online. However, fundamental fairness principles require many proceedings, including criminal trials, to be conducted in person. The pandemic has made that task extraordinarily difficult. Trials, in particular, are uniquely complex, as they require involvement not only of parties, counsel, and the court, but also, potentially, of court reporters; courtroom artists; United States Marshals; Courtroom Security Officers; technicians; and venire and petit jurors, among others. Plainly, the number of participants in the courtroom during trial inherently introduces heightened risk of COVID-19 exposure, as does the reality of jury deliberations—which require potentially prolonged discussions in relatively close quarters in a jury room to reach a verdict—if unvaccinated individuals are present.

The administrative complexity of holding trials during the pandemic has made it difficult to advance these cases, contributing to a growing backlog of both civil and criminal matters. It concerns the court that Mr. Elias and Mr. Thompson have been detained, pre-trial, for approximately two and a half years.[8] And it further concerns the court that they have been detained under

---

[7] Omicron Variant: What You Need to Know, Ctrs. for Disease Control and Prevention (Dec. 20, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last visited Jan. 12, 2022).

[8] Mr. Elias and Mr. Thompson were charged in the July 11, 2019 Superseding Indictment. (Superseding Indictment (Dkt. 71).) On July 16, 2019, they were arraigned and ordered detained pending trial. (Min. Entry (Dkt. 109); Order of Detention (Dkt. 110); Min. Entry (Dkt. 120); Order of Detention (Dkt. 121).)

unreasonably and unusually harsh conditions, which have been described in other litigation as "more punitive" during the pandemic than before—"essentially the equivalent of either time and a half or two times what would ordinarily be served." Sentencing Tr. at 17:17-18:5, *United States v. Gonzalez*, No. 18-cr-699 (JPO) (S.D.N.Y. April 16, 2021) (Dkt. 250).

Lockdowns—typically a measure that is used to punish disciplinary infractions—have become a frequently pulled lever to mitigate the risk of transmission at the Metropolitan Detention Center (the "MDC"). The Federal Defenders of New York have reported extensively on systemic problems at the MDC, including electrical blackouts; broken sewage systems; inadequate food supplies; and rates of COVID-19 infection among detainees and staff that far exceed transmission levels outside of the facility. *See, e.g.*, Status Rep. by Fed. Defenders, *Federal Defenders of New York, Inc. v. Federal Bureau of Prisons*, No. 19-cv-660 (MKB) (PK) (E.D.N.Y. October 13, 2021) (Dkt. 240). Recently, the court has been alerted to the ongoing barriers to accessing testing and treatment; limitations on access to the library to review discovery and handle other litigation matters; and the cessation of in-person legal visits, which is purportedly a temporary response to Omicron.[9] (*See, e.g.*, Defense Counsel Ltr. (Dkt. 580) at 1-2 (reporting on January 5, 2022, that "the MDC has been shuttered to attorney-client visitation since the Christmas Holiday, due to the spread of the new COVID-19 variant")); *see also* Jan. 8, 2022 Min. Entry, *Federal Defenders of New York, Inc.*, No. 19-cv-660 ("Due to the rise in staff and inmate COVID-19 cases at the MDC, the MDC suspended all visitation at the facility on December 27, 2021, with plans to reopen after the number of cases drops. Since

---

[9] Defense counsel explains, and the court agrees, that in-person communication is far superior to video or telephone calls (which have also been curtailed) for establishing an effective attorney-client relationship. The denial of those opportunities is gravely concerning to this court.

the suspension of visitation, the facility has experienced challenges with the completion and rescheduling of legal calls and videoconferences."). And yet, COVID continues to spread within its walls: On January 4, the MDC reported that it had identified at least 250 infected inmates and 157 infected staff members, Status Report by Federal Defenders at 2, *Federal Defenders of New York, Inc.*, No. 19-cv-660 (E.D.N.Y. Jan. 5, 2022) (Dkt. 273), and the court receives frequent requests to adjourn scheduled proceedings on account of detained defendants testing positive or experiencing symptoms of the virus.

The court can help lessen this backlog by advancing trial-ready cases, subject to the best available COVID-19 safety protocols.[10] If it does not do so, then in-custody criminal defendants will continue to endure prolonged pre-trial detention, under unreasonably punitive conditions of custody, as new cases add to the court's backlog and compound the existing strain on the Bureau of Prisons.

The court, which has a responsibility to respond to the problems introduced by the pandemic, has discretion to implement "reasonable response[s] to the problems and needs confronting the court's fair administration of justice." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016). Because a policy of excluding unvaccinated individuals from the jury venire would facilitate the court's ability to hold trials by reducing health risks and the likelihood of disruption, the court considers the constitutional and statutory implications of that policy below.

---

[10] These protocols include comprehensive social distancing and masking policies enacted by the Eastern District of New York in consultation with its epidemiologist. This court's addition of a juror vaccination requirement to its own proceedings is an important trial-specific precaution to reduce the risks of mistrial and disruption, in addition to mitigating health risks, and is intended to supplement the court's current protocols.

5

## II. APPLICABLE LAW

Criminal defendants have a well-established right to a jury pool drawn from a fair cross-section of the community. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed"); 28 U.S.C. § 1861 (codifying the right to "juries selected at random from a fair cross section of the community in the district or division wherein the court convenes"); *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975) ("[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community.").[11] This right applies to the jury pool but does not extend to the petit jury. *Lockhart v. McCree*, 476 U.S. 162, 174 (1986).

In *Duren v. Missouri*, 439 U.S. 357 (1979), the Supreme Court established the framework for evaluating claims that jury selection procedures violate the fair cross-section requirements safeguarded by the Constitution and the Jury Selection and Service Act (JSSA), 28 U.S.C. § 1861 *et seq*. Under the *Duren* framework, the movant bears the initial burden of establishing a *prima facie* case for a violation by showing:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systemic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364. If the movant satisfies this *prima facie* showing, then the burden shifts to the non-movant to demonstrate that the violation was justified because "a fair cross section

---

[11] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

[would] be incompatible with a significant state interest." *Id.* at 368.

Absent a constitutional or statutory violation, district courts have "broad discretion" in selecting a jury. *See generally United States v. Torres*, 128 F.3d 38, 43-44 (2d Cir. 1997).

## III. DISCUSSION

The court has proposed excluding jurors who are not fully vaccinated against COVID-19 from the jury pool to mitigate risks of transmission and trial disruption caused by the virus, and it has asked the parties for their positions on that proposal. Defendants objected. The court, applying the *Duren* analysis, concludes that a policy of excluding jurors who are not fully vaccinated against COVID-19 does not violate Defendants' fair cross-section rights, and is within its inherent authority to respond to the challenges created by the pandemic. *See Dietz*, 579 U.S. at 45; *see also United States v. Liberto*, No. 19-cr-0600, 2021 WL 4459219, at *8 (D. Md. Sept. 29, 2021) (overruling defendant's objection to asking prospective jurors about vaccination status during *voir dire*, finding that "asking the vaccination status of potential jurors is in keeping with this Court's policy in the face of the COVID-19 Pandemic").

### A. The *Duren* Analysis

#### 1. The *Prima Facie* Case for a Violation

The threshold question under *Duren* is whether individuals who are not vaccinated against COVID-19 qualify as a distinctive group for fair cross-section purposes. Individuals who choose to remain unvaccinated against COVID-19 may hold shared perspectives, but "merely having shared attitudes does not qualify a group as distinctive." *United States v. Moses*, No. 19-cr-06074 (EAW), 2021 WL 4739789, at *3 (W.D.N.Y. Oct. 12, 2021) (analyzing the fair cross-section requirement under the Sixth

Amendment and the JSSA in a criminal case); *see also Lockhart*, 476 U.S. at 174 ("[G]roups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors . . . are not 'distinctive groups' for fair-cross-section purposes.")

The Supreme Court's analysis in *Lockhart* is instructive. *See* 476 U.S. 162. There, a defendant in a capital prosecution objected to the exclusion of jurors who held beliefs that would have prevented them from voting for a capital sentence, referred to as "*Witherspoon*-excludables" under the principles set out in *Witherspoon v. Illinois*, 391 U.S. 510 (1968). The Court explained that, although it would not "attempt[] to precisely define the term 'distinctive group,'" it was clear that the "concept of 'distinctiveness' must be linked to the purposes of the fair-cross-section requirement." Quoting *Taylor*, it explained that those purposes are to:

> (1) guard[] against the exercise of arbitrary power and ensuring that the commonsense judgment of the community will act as a hedge against the overzealous or mistaken prosecutor, (2) preserv[e] public confidence in the fairness of the criminal justice system, and (3) implement[] our belief that sharing in the administration of justice is a phase of civic responsibility.

*Id.* at 174-75. The Court further observed that, historically, the fair cross-section requirement was violated where potential jurors were excluded based on immutable characteristics, with the effect of "depriv[ing] members of these often historically disadvantaged groups of their right as citizens to serve on juries in criminal cases." *Id.* at 175. It explained that a person's viewpoint on the death penalty, in contrast, is voluntary and changeable, such that exclusion of that person does not "create an appearance of unfairness." *Id.* at 176. Accordingly, the Court held that, even if the fair cross-section requirements were to apply to the petit jury, the challenge would still fail the *Duren* framework because

8

*Witherspoon*-excludables do not comprise a distinct group whose exclusion "arbitrarily skew[s] the composition of [] juries." *Id.*

The court reaches the same conclusion as to unvaccinated individuals. As in *Lockhart*, the basis for excluding potential jurors here is "an attribute that is within the individual's control," that is, their vaccination status, rather than "some immutable characteristic such as race, gender, or ethnic background." *Id.* at 175-76; *see also Joffe v. King & Spalding LLP*, No. 17-cv-3392 (VEC), 2021 WL 5864427, at *6 (S.D.N.Y. Dec. 10, 2021) ("[M]embership in the unvaccinated group changes on a daily basis."). And, as in *Lockhart*, excluding unvaccinated jurors from this court's trial does not "lead[] to [a] substantial deprivation of their basic rights of citizenship," because it "does not prevent them from serving as jurors in other criminal cases." *Id.* at 176.

Nor is there information sufficient to persuade the court that vaccination status is a proxy for a characteristic of a distinctive group, like race, gender, or ethnicity, such that exclusion of unvaccinated jurors would be a proxy for excluding a distinctive class.[12] The court is regrettably handicapped by incomplete data

---

[12] If a movant were able to demonstrate that vaccination status is a proxy for race, gender, or ethnicity, then they may be able to state a viable claim under the Equal Protection Clause, which "forbids the exclusion of racial minorities from grand and petit juries." *United States v. Schulte*, No. 17-cr-548 (PAC), 2021 WL 1146094, at *3 (S.D.N.Y. Mar. 24, 2021).

"The [Equal Protection] test is similar, but not identical, to the Sixth Amendment *Duren* test." *United States v. Scott*, No. 20-cr-332 (AT), 2021 WL 2643819, at *10 (S.D.N.Y. June 28, 2021). "To succeed on a Fifth Amendment equal protection challenge to a criminal jury selection system, the defendant must establish that (1) there is a cognizable group, (2) that is substantially underrepresented by reason of (3) a selection procedure that is not racially neutral, *i.e.*, is the result of intentional discrimination by the District." *United States v. Rioux*, 97 F.3d 648, 659 (2d Cir. 1996).

Because the court cannot conclude, on the data available to it, that vaccination status is a proxy for a distinct or cognizable group, it also cannot

in undertaking this analysis: according to the CDC, race and ethnicity data is available for only 74% of vaccinated individuals nationwide.[13] The court therefore must rely on the CDC's assessment that disparities on race and ethnic lines, though initially broad, have "narrowed over time,"[14] and on data reported by New York City[15] indicating that 53% of Black adults, 59% of white adults, 66% of Hispanic/Latinx adults, 91% of Asian/Pacific Islander adults, and 99% of Native American/Alaska Native adults are fully vaccinated citywide.[16] This data—though incomplete—does not suggest that excluding unvaccinated jurors would proximately exclude individuals based along historically

---

conclude that excluding unvaccinated jurors would violate the Equal Protection Clause.

[13] Nambi Ndugga, Latoya Hill, Samantha Artiga, and Sweta Haldar, *Latest Data on COVID-19 Vaccinations by Race/Ethnicity*, Kaiser Health Foundation (Dec. 15, 2021), https://www.kff.org/coronavirus-covid-19/issue-brief/latest-data-on-covid-19-vaccinations-by-race-ethnicity/ (last visited Jan. 12, 2022) ("As of January 10, 2022, CDC reported that race/ethnicity was known for 74% of people who had received at least one dose of the vaccine.").

[14] *Id.*

[15] While the court is unaware of reported data for the Eastern District or by county, New York City reports data by borough, including that, in Brooklyn—one of the boroughs from which the Eastern District's jury pools are drawn—75% of residents are vaccinated boroughwide, with 52% of Black residents, 52% of white residents, 92% of Asian/Pacific Islander residents, and 63% of Hispanic/Latinx residents fully vaccinated. In Staten Island, another borough within the Eastern District, the data is similar: 77% of residents are vaccinated boroughwide, with 63% of Black residents, 62% of white residents, 98% of Asian/Pacific Islander residents, and 68% of Hispanic/Latinx residents fully vaccinated. *See id.* The court notes that the borough-by-borough breakdown includes vaccination rates for New Yorkers of all ages. The inclusion of minors in this data, who may have different vaccination rates and who are ineligible for jury duty, is likely to inherently skew the available data for the purpose of this analysis.

[16] Vaccinations by Demographic Group, N.Y.C. Health Dep't, https://www1.nyc.gov/site/doh/covid/covid-19-data-vaccines.page#borough (last visited January 12, 2022).

disenfranchised lines. Nor does it suggest that they would be disproportionately underrepresented in violation of the second element of the *Duren* test. Accordingly, the court cannot conclude that the fair cross-section requirement would be violated on either of those grounds.

The third element of the *Duren* test—the systemic exclusion inquiry—requires a showing that "the underrepresentation is due to the system of jury selection itself, rather than external forces." *Schulte*, 2021 WL 1146094, at *7 (quoting *Rioux*, 97 F.3d at 658). That element cannot be satisfied here. As explained in *Joffe*, in analyzing a fair cross-section challenge in a civil case, "[t]he COVID-19 pandemic and the effects that it has had on in-person proceedings are external forces" on the court. 2021 WL 5864427, at *6 (collecting cases). A fair cross-section challenge would therefore also fail under the systemic exclusion element of the *Duren* analysis.

        2.   The Burden-Shifting *Duren* Analysis

Even if the court were to assume that the requirements for showing a *prima facie* case could be met, any such putative violation would be lawful under the second step of *Duren*'s burden-shifting analysis. This step requires demonstrating that the putative violation would be justified because "a fair cross section [would] be incompatible with a significant state interest." *Duren*, 439 U.S. at 368.

The state has a compelling interest in preventing the spread of COVID-19, which has devastated communities and repeatedly overwhelmed the country's health infrastructure. *See, e.g., Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID–19 is unquestionably a compelling interest."). Vaccinations are an important and effective tool for furthering that interest. *See* Jan. 10, 2022 Min. Entry, *CNS P'nrs v. City of New York*, No. 22-cv-00037 (AMD) (PK) (E.D.N.Y.) (denying motion to temporarily enjoin the vaccination

11

mandate for private employers in part because vaccination serves the "government's overriding interest in stemming the spread of the COVID-19 virus and protecting the public health"). As explained in detail, *supra*, the state also has a substantial interest in the adjudication of trial-ready cases to reduce the strain on the justice system created by the backlog of cases pending trial. Empaneling a jury that includes unvaccinated jurors would directly contradict those significant interests by increasing the risk of COVID-19 transmission and the potential for disruption during trial, and by further delaying this court's administration of justice. The court therefore concludes that, even if their exclusion were to amount to a fair cross-section violation, the decision would nonetheless be justified in service of the state's overwhelming interests in combatting the pandemic and advancing cases to trial.

### B. Authority to Exclude Unvaccinated Jurors under the JSSA

The JSSA authorizes the court to exclude potential jurors on the grounds that, *inter alia*, their service "would be likely to disrupt the proceedings," 28 U.S.C. § 1866(c)(2), or that it "would be likely to . . . adversely affect the integrity of jury deliberations," *id.* § 1866(c)(5). As discussed *supra*, New York City is experiencing a surge in COVID-19 infections, driven by the highly transmissible Delta and Omicron variants. The court is concerned with the increased health risk of involving unvaccinated jurors in trial and with the likelihood of disruption if jurors, or other essential trial participants, were to become ill and need to quarantine. It is also concerned with the reasonable fear that vaccinated jurors may have of serving alongside unvaccinated jurors, which may affect the integrity of their deliberations. The court finds that excluding individuals who are not fully vaccinated against COVID-19 is the most effective method for minimizing risk of disruption to the proceedings and protecting the integrity of the jury deliberations.

## IV. CONCLUSION

For the reasons explained above, the court concludes that excluding individuals who are not fully vaccinated against COVID-19 from the jury venire is a lawful exercise of its discretion. This holding is intended to reduce the risk of COVID-19 transmission in the courtroom, to facilitate the administration of trials, and to help cure the backlog of trial-ready cases.

Accordingly, and unless otherwise stated, the court adopts this policy for all of its upcoming civil and criminal jury trials, including this one. The court will reconsider its policy, if warranted, as conditions of the pandemic change.

SO ORDERED.

Dated:   Brooklyn, New York
         January 13, 2022

                                          /s/ Nicholas G. Garaufis
                                          NICHOLAS G. GARAUFIS
                                          United States District Judge