UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

MATTHEW ELIAS and LATIFF THOMPSON,

      Defendants.

**MEMORANDUM & ORDER**

**18-CR-33 (S-2) (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

With jury selection currently underway, Defendant Latiff Thompson moves to suppress a pair of bloody gloves the government soon expects to introduce in this case.

For the reasons set forth below, the motion is GRANTED.

**I. WAIVER**

 **A. Timeliness**

  1. Legal Standard

Federal Rule of Criminal Procedure 12 provides that "[i]f a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3). The Second Circuit has construed this permissive language as mandatory, holding that a district court may *only* consider the motion with cause. *See United States v. Yousef*, 327 F.3d 56, 125 (2d Cir. 2003) ("Under Rule 12([c]) a district court may excuse waiver of a pre-trial suppression argument *only* for cause shown.").[1]

---

[1] When quoting cases, unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

1

2. Discussion

A motion such as Thompson's must ordinarily be made *in limine* well in advance of trial. In this case, the court "set a deadline for the parties to make pretrial motions" by so-ordering the parties' proposed motion schedule on February 24, 2022. (Dkt. 594); Fed. R. Crim. P. 12(c)(1). That schedule set a deadline of March 1, 2022. *Id.* Otherwise, the default deadline in Rule 12 would have been the "start of trial." *Id.* This court's Individual Rules also require that motions *in limine* be ordinarily "filed no later than 45 days before commencement of jury selection," but provides for different timelines when "otherwise directed by the court." (*See* Individual Rules of Judge Nicholas G. Garaufis, March 7, 2022.)

The Second Circuit has not defined when the "start of trial" is for the purposes of Rule 12. This court adopts the approach of the Sixth Circuit – apparently the only Court of Appeals to have considered the question – as designating it as the moment when jeopardy attaches. *See United States v. Nicholson*, 716 F. App'x 400, 413 (6th Cir. 2017) (finding error when the district court "[held] that the motion during *voir dire* was untimely"); *see also United States v. Johnson*, 944 F.2d 396, 406 (8th Cir. 1991) (surveying the many different contexts and varying holdings as to when a jury trial begins). Because the court further concludes that the discretionary language permitting a trial court to set an earlier deadline equally empowers it to move the deadline later (just not later than when jeopardy attaches), the court concludes that Thompson's motion is timely.

B. Good Cause

Even if Thompson's motion were not timely, however, the court nonetheless concludes that he has shown good cause to excuse any waiver.

1. Legal Standard

The Second Circuit has only considered the meaning of "good cause" under Rule 12 on a handful of occasions, apparently never finding that an appellant had satisfied it.[2] Sometimes, no causal explanation was available on review. Other times, where it was, the court has concluded that at least three circumstances *do not* establish good cause: waiver because of (1) attorney error; (2) attorney strategy; or (3) attorney failure to consult their client. *See United States v. Forrester*, 60 F.3d 52, 59 (2d Cir. 1995) (attorney mistake); *United States v. Yui-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995) (strategy to not object); *United States v. Howard*, 998 F.2d 42, 52 (2d Cir. 1993) (failure to consult with client).

A district court need not consider whether its refusal to excuse waiver would result in potential prejudice to a defendant.[3]

2. Discussion

a. *Factual Background*

The events of this case begin in the early morning of September 7, 2017, when Defendants Latiff Thompson and Matthew Elias were pulled over after allegedly failing to stop at a stop sign. The timing was bad for them because, the government alleges, Elias and Thompson – along with two of their co-defendants on the second superseding indictment, both of whom pleaded guilty, Lawrence Woods and Tyquan Henderson – were then fleeing from their commission of a robbery in South Jamaica, Queens.

---

[2] *United States v. Kopp*, 562 F.3d 141, 143 (2d Cir. 2009) (finding no prejudice, assuming *arguendo* that the appellant could demonstrate good cause); *United States v. Yousef*, 327 F.3d at 125 (finding no good cause); *United States v. Crowley*, 236 F.3d 104, 110 (2d Cir. 2000) (finding no good cause); *United States v. Wilson*, 11 F.3d 346, 353 (2d Cir. 1993) (same).

[3] On appeal, by contrast, the Second Circuit considers actual prejudice as well as good cause, reviewing refusals to consider an untimely suppression motion for either abuse of discretion or a clear error. *See United States v. Crowley*, 236 F.3d at 110; *Howard*, 998 F.2d at 52.

The New York Police Department officers who stopped the vehicle had no knowledge of the robbery, but after running their licenses, the officers came to believe that the four men had suspected gang ties. At some point, all four were ordered out of the car and frisked for weapons. Police found a firearm in Thompson's waistband and, knowing that at least one of the men in the car had been a previously convicted felon, arrested all four for unlawful possession of the gun.

Later that day, at booking, the police inventoried various of the men's possessions and allegedly recovered a bloody sweatshirt belonging to Henderson and a pair of bloody gloves belonging to Thompson. It is unclear whether the blood on the sweatshirt was ever submitted for any laboratory analysis. (March 15, 2022 Hearing Tr. at 29:24.) But the gloves unquestionably were not: not to determine whether the substance actually was blood nor to determine whether the blood on the glove matched that of the blood on the sweatshirt. (*Id.* at 30:1-8.) Nor was the blood later tested to see if it matched that of a victim whom the government now alleges occupied the apartment and was tied up and brutally beaten over the course of the robbery. (*Id.* at 12:10-12.) None of these analyses were done because the NYPD was still only investigating the unlawful possession of a firearm – not a violent robbery.

Eventually the Queens County District Attorney charged Defendants as felons in possession. But those charges were dropped after Queens Supreme Court Justice John Latella suppressed the evidence of the firearm recovered from Thompson. The officers, that court held, had frisked the men without reasonable suspicion to believe they might be armed. (*See* Tr. of State Court Suppression

Hearing (Dkt. 437-1) at 56.)[4] The state court never addressed suppression of the sweatshirt or gloves.[5]

If admitted, the gloves would be significant evidence in this case and could well influence its outcome. Thompson argues that the gloves (1) tend to show that he was inside the apartment that was robbed, which he denies; (2) tend to show that he likely participated in, or was at least aware of, the assault of the apartment's tied-up occupant, which he denies; (3) tend to corroborate cooperating witness testimony against him; and (4) tend to contradict the statement Thompson made to the FBI. (*See generally* Mot. to Suppress (Dkt. 616).) In that critical statement – essentially, a confession – Thompson denies he went inside the apartment:

> Agent 3: Where did the blood come from?
>
> L. THOMPSON: The blood came from that fu\*\*ing that robbery.
>
> Agent 3: Somebody… you never really got in there.

---

[4] This court does not decide the constitutionality of the frisk, although it perceives no error in Justice Latella's reasoning on the facts adduced in the state suppression hearing.

[5] The government now suggests that, even if the frisk was unjustified, the police's later discovery of the gloves during booking "attenuates" the illegal taint. *See Nardone v. United States*, 308 U.S. 338, 341 (1939). (*See also* March 15, 2022 Hearing Tr. at 6:17-20.) Without an independent or intervening event to break the chain of causation however, it is unclear how that could be. The court is aware of no case in which a short passage of time alone suffices to create attenuation. *See, e.g.*, *Utah v. Strieff*, 579 U.S. 232, 238 (2016) ("Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.")

> L. THOMPSON: I never got in there
>
> Agent 3: I'm saying supposedly somebody got f*cked up
>
> L. THOMPSON: Somebody got f*cked up in there.
>
> Agent 3: What happened…they never tried to come back or nothing?
>
> L. THOMPSON: Nah, I don't know. . .

(*See* Elias Mot. in Limine Ex. A (Dkt. 598) at ECF p. 15.)

    b.  *The Proceedings in this Court*

Having described the factual backdrop and the significance of the evidence in question, the court now turns to the events that have transpired up to now in this court.

Most critical is what has not happened: This court has never addressed suppression – not of Henderson's sweatshirt, Thompson's gun, or Thompson's gloves – because the government led the defense and the court to believe the issue was moot. When the court considered motions *in limine* in this case, before Henderson had pleaded guilty, the government submitted the following, in full:

> IX. Suppression of Elias Automobile Search
>
> Defendants Henderson (DE 411), L. Thompson (DE 416) and Woods (DE 404) have moved for the suppression of evidence and Defendant Elias (DE 419) seeks the dismissal of Count Four of the Second Superseding Indictment regarding the September 7, 2017 traffic stop of Elias's vehicle at the intersection of Barron Street and 116 Avenue in South Jamaica, Queens. The basis for suppression and dismissal is that a firearm that was recovered as a result of the defendants has previously been ruled unlawful by a New York State Supreme Court Justice.

6

> The government does not intend to introduce the firearm recovered from Elias's vehicle on September 7, 2017 as evidence regarding the September 7, 2017 robbery. Thus *the suppression motions filed by defendants Henderson, L. Thompson and Woods should be denied as moot*. The government does, however, intend to introduce evidence through co-conspirator statements regarding the use of firearms during the September 7, 2017 robbery and that the proceeds of the robbery included firearms. As a result, defendant Elias's motion to dismiss Count Four of the Second Superseding Indictment should be denied.

(Gov't Opp'n (Dkt. 427) at 63-64 (emphasis added).)

Assuming the truth of the government's representations, this court ruled accordingly:

> VI. MOTIONS TO SUPPRESS AND DISMISS
>
> A. Suppression of Evidence Identified in Automobile Search and Motion to Dismiss Count Four
>
> Defendants Henderson, Thompson, and Woods move to suppress evidence from the September 7 traffic stop during which police searched Elias's car and identified a firearm *and other items*, on the grounds that the search violated the Fourth Amendment. (Henderson Mot. (Dkt. 411); Thompson Mot. (Dkt. 416); Woods Mot. (Dkt. 404).) Relatedly, Defendant Elias moves to dismiss Count Four of the Second Superseding Indictment on the grounds that the Government cannot show a Section 924(c) violation based on evidence obtained in violation of the Fourth Amendment. (Elias Mot. (Dkt. 419) at 2.) The Government submits that it intends to rely on testimonial evidence for Count Four and does not intend to seek to introduce evidence of the firearm. (Gov't Opp. at

7

> 64). Accordingly, Elias's motion to dismiss is denied, and Henderson's, Thompson's, and Woods's motions to suppress the firearm are *denied as moot*.

(July 8, 2021 Memorandum & Order (Dkt. 516) at 22-23 (emphasis added).)

By the time motion practice began, Henderson's sweatshirt was known to be evidence, but the government had apparently never indicated to the defense that gloves had been found on Thompson. No reference to them ever appeared in any party's motions, and the government now concedes that no Rule 16 disclosure was made acknowledging their existence until December 21, 2021 – almost six months after the court held the original suppression motion moot. When the gloves were finally disclosed, the "NYPD Property Clerk Invoice" – itself dated September 7, 2017 – was included among hundreds of other documents. (*See* Mot. to Suppress Ex. 1 (Dkt. 616-1).) The government apparently never otherwise mentioned them.

Thompson's lawyer, for his part, simply missed the significance of the disclosure until he reviewed it with his client, who pointed it out this week. That error would be fatal in the normal course. *See, e.g., Indiviglio v. United States*, 612 F.2d 624, 631 (2d Cir. 1979).

But this is not the normal course. Thompson's counsel was prohibited from meeting with his client in advance of trial for nearly two months because of COVID-19 policies imposed by the Metropolitan Detention Center (the "MDC") that entirely halted lawyer visitation during this winter's Omicron surge. Thompson's inability to aid in the preparation of his trial forced this court to twice reschedule his trial date. (*See* Mot. to Continue (Dkt. 580); January 6, 2022 Minute Entry; January 19, 2022 Minute Entry; January 27, 2022 Minute Entry.) The court even entertained (but ultimately denied) an application for Thompson's bail under 18

8

U.S.C. § 3142(i) in order to facilitate the preparation of his defense. (*See* Motion for Bond (Dkt. 582); February 14, 2022 Minute Entry.) Even when MDC legal visits ultimately resumed, Thompson was still unable to review the voluminous discovery material in his case on his own outside of periods for attorney visitation. (*See* February 14, 2022 Minute Entry.)

Moreover, the court is troubled by the government's representations in this case, which have been unfortunately imprecise. The government's first motion *in limine* addressed itself to the "Suppression of Elias Automobile Search." The court's opinion expressly addressed a "firearm *and other items*" resulting from that search. Had the government been planning all along to introduce gloves it knew were the fruits of that search, during motion practice it plainly should not and could not have urged this court that "the suppression motions filed by defendants Henderson, L. Thompson and Woods should be denied as moot." (Gov't Opp'n (Dkt. 427) at 64.)

More recently, the government has continued to tiptoe around the evidence in this court's consideration of the parties' evidentiary motions *in limine*. The government's submission read:

> As was briefed in the pre-trial motions in this matter, defendants Henderson, Thompson and Woods moved to suppress the evidence recovered from the September 7, 2017 traffic stop by the NYPD and Elias moved to dismiss Count Four of the Second Superseding Indictment. See ECF Dkt. Nos. 404 (Woods), 411 (Henderson), 416 (Thompson) and 419 (Elias). In its response brief, the government indicated that it did not intend to introduce the firearm recovered from Elias's vehicle on September 7, 2017 as evidence regarding the September 7, 2017 robbery, and instead intended to rely on testimonial evidence for proof of the use of firearms for purposes of establishing the § 924(c) count. The Court denied the

9

defendants' motions to suppress as moot and denied Elias's motion.

(*See* Gov't Evidence Mot. (Dkt 597) at 3-4.) Once more, the government purported to address "the evidence recovered," but then immediately pivoted only to the firearm recovered, with no mention of the bloody gloves. Again in a letter to the court on March 8, 2022, the government emphasized that it "does not intend to introduce evidence from the NYPD that a firearm was recovered during a frisk of Thompson during the car stop" and claimed it had adopted a "tailored approach, to remove references to the frisk of Thompson." (See March 8, 2022 Letter (Dkt. 609).) But the court fails to understand how it could have been planning to introduce bloody gloves directly traceable to Thompson's frisk without ever considering the constitutionality of that frisk.

Given the circumstances, the court concludes that Thompson has satisfied good cause even if the motion had been untimely and such a showing was required.

## II. RULE 16

### A. Legal Standard

Having established the propriety of considering Thompson's motion, the court pauses to describe its authority to order suppression as a remedy. Here, the court orders suppression consistent with its authority under Rule 16, rather than to prophylactically deter police misconduct under the Fourth Amendment. *See* Fed. R. Crim. P. 16; *United States v. Leon*, 468 U.S. 897, 916 (1984). In accordance with Rule 16, the court has the authority to "prohibit [a] party from introducing [] undisclosed evidence" and to "enter *any other order that is just under the circumstances*." Fed. R. Crim. P. 16(d)(2)(C), (D) (emphasis added).

### B. Discussion

Thompson argues that "in fulfilling its Rule 16 discovery obligations, the government did not provide notice of bloody gloves either recovered from or attributed to Mr. Thompson." (Mot. to Suppress at 2.) The government concedes that its only disclosure was the one made in December 2021, and it appears to have provided no Rule 404(b) notice to Defendants to the extent that the gloves may constitute "bad act" evidence.[6] (*See* March 15, 2022 Hearing Tr. at 4:22-25, 5:1-9.) Nor apparently did it "permit the defendant to inspect . . . tangible objects . . . within the government's possession, custody, or control [that are] . . . material to preparing the defense [and which] the government intends to use . . . in its case-in-chief at trial," to the extent Defendants made that request. Fed. R. Crim. P. 16(a)(E).[7]

Under these circumstances, the court concludes that Rule 16 has been violated and that the appropriate remedy is suppression of the gloves. *See United States v. Salameh*, 152 F.3d 88, 130 (2d Cir. 1998) ("A district court has broad discretion in fashioning a

---

[6] The court previously noted that Rule 404(b) might apply to, in the government's words, "evidence of certain uncharged crimes, acts, and association evidence that is inextricably intertwined with, completes the story of, and provides essential background for the charged conduct . . . includ[ing] . . . evidence of the September 7, 2017 car stop and subsequent arrests and detention of Elias and Thompson." But, not knowing that bloody gloves allegedly belonging to Thompson were among such "evidence of the . . . stop," the court did not have the opportunity to consider them specifically. (*See* March 10, 2022 Memorandum & Order (Dkt. 613) at 7; Gov't Evidence Mot. at 7.)

[7] The government contends that Defendants were on notice of the evidence because "in our March 1st motion in limine, [we] made reference that we would intend to introduce bloody clothing as part of our case. That was not opposed at any point by the defense in Mr. Thompson's response." (*Id.* at 5:4-7.) But Thompson, of course, did not have Fourth Amendment standing to seek the suppression of Henderson's sweatshirt and was unaware that his gloves were among the bloody clothing.

11

remedy for the government's violation of its obligations under Rule 16(a), including ordering the exclusion of evidence.").

Although alternative remedies, including a third adjournment of this trial, are possible, they are not appropriate here. Both defendants in this case have been held at the MDC pre-trial for more than two and a half years in conditions during the pandemic that the court has previously described as "unreasonably and unusually harsh." *United States v. Elias*, No. 18-CR-33 (S-2) (NGG), 2022 WL 125721, at *3 (E.D.N.Y. Jan. 13, 2022). Moreover, this case is but one in an "alarmingly oversized backlog of trial-ready cases" that continue to await resolution. *Id.* Given the public health restrictions this district continues to operate under, a limited number of criminal cases have been tried during the pandemic. Under current protocols, only a few open criminal trial dates remain this calendar year. Every additional delay carries a dominoing and prejudicial effect on not just these defendants, but all others still awaiting trial – none of whom yet stand convicted of anything.

The government has had ample opportunity to ensure that the court would consider the admission of this evidence at trial. But it never alerted the court to it.

### III. CONCLUSION

For these reasons, Thompson's motion is GRANTED.

SO ORDERED.

Dated:   Brooklyn, New York
         March 16, 2022

　　　　　　　　　　　　　　　　　　　　　　　/s/ Nicholas G. Garaufis
　　　　　　　　　　　　　　　　　　　　　　　NICHOLAS G. GARAUFIS
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge