UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

MATTHEW ELIAS and LATIFF THOMPSON,

Defendants.

**MEMORANDUM & ORDER
18-CR-33 (S-2) (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

On March 25, 2022, Latiff Thompson and Matthew Elias were convicted by a jury of committing Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count Three of the superseding indictment), and the unlawful use or carrying of a firearm during and in relation to that robbery, in violation of 18 U.S.C. § 924(c) (Count Four). Each defendant now moves pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal. Elias also moves for a new trial under Rule 33.

For the reasons set forth below, the motions are all DENIED.

## I.   BACKGROUND

Thompson's and Elias's convictions stem from their participation in a September 7, 2017, robbery of a drug dealer's stash house in Jamaica, Queens. The leader of a set of the Makk Balla Brims gang, Shamiek Hytmiah, received a tip that nearly a half million dollars of cash and drugs was inside the stash house, so he recruited a team, which ultimately included Thompson and Elias, to steal it. During the robbery, the team tied up and assaulted the stash house's occupant and stole marijuana and a safe from inside, but ultimately found far less loot than originally expected. Several members of the robbery team carried guns. Thompson went inside. Elias was the driver.

The Government's evidence at trial consisted primarily of witness testimony, including from cooperating witness Hytmiah; a post-arrest interview Thompson gave to the FBI; cell site location records and other cellphone data; and audio from jail calls Thompson and Elias made after their arrests. Thompson's defense was that although he knew there would be a robbery, he stayed outside and never knew guns would be used. Elias claimed he was a dollar cab driver unaware he had driven his friends to a robbery.

### A. Legal Standards

#### 1. Rule 29

Rule 29 provides that a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a); *see also* Fed. R. Crim. P. 29(c)(2) ("If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."). The standard that guides the court's analysis of a Rule 29 motion is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005), "not whether *this court* believes that the evidence at trial established guilt beyond a reasonable doubt." *United States v. Brown*, 937 F.2d 32, 35 (2d Cir. 1991) (emphasis added).[1] In challenging the sufficiency of the evidence, defendants face "an uphill battle," and bear "a very heavy burden" because the court must evaluate the evidence "in the light most favorable to the Government, with all reasonable inferences drawn in favor of the verdict." *United States v. Crowley*, 318 F.3d 401, 407 (2d Cir. 2003). Nevertheless, "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt

---

[1] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021).

Furthermore, in deciding a Rule 29 motion, the court must resolve all issues of credibility in favor of the Government and the jury's verdict. *See United States v. Canady*, 126 F.3d 352, 356 (2d Cir. 1997) (Government); *United States v. Desena*, 260 F.3d 150, 154 (2d Cir. 2001) (jury's verdict). Thus, "[m]atters of the choice between competing inferences, the credibility of witnesses, and the weight of the evidence are within the province of the jury," and the court is "not entitled to second-guess the jury's assessments." *United States v. Rea*, 958 F.2d 1206, 1221-22 (2d Cir. 1992). Rule 29 does not provide the court "with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006). The court "must affirm the conviction so long as, from the inferences reasonably drawn, the fact finder might fairly have found guilt beyond a reasonable doubt." *Canady*, 126 F.3d at 356.

### 2. Rule 33

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Although the court generally has "broader discretion," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992), "to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, courts must nonetheless exercise Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Coté*, 544 F.3d 88, 101 (2d Cir. 2008) (quoting *Sanchez*, 969 F.2d at 1414). That is, while "[i]n the exercise of its discretion, the court may weigh the evidence and credibility of witnesses," *Coté*, 544 F.3d at 101, "courts generally must defer to the jury's resolution of conflicting evidence and the assessment of witness credibility,"

*United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 1997), and "may not wholly usurp the jury's role." *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000). Additionally, the court must make a "comprehensive assessment of the evidence" by "consider[ing] any reliable trial evidence as a whole, rather than on a piecemeal basis." *United States v. Archer*, 977 F.3d 181, 189, 196-97 (2d Cir. 2020). Thus, "it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Ferguson*, 246 F.3d at 133-34. Although the Second Circuit has "not defined exactly what constitutes an 'extraordinary circumstance' sufficient to warrant Rule 33 relief," examples include "situation[s] in which . . . the evidence was patently incredible or defied physical realities, . . . where an evidentiary or instructional error compromised the reliability of the verdict . . . , or where the government's case depends upon strained inferences drawn from uncorroborated testimony." *Landesman*, 17 F.4th at 330-31.

At bottom, "[t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134. A manifest injustice arises when the court has "a real concern that an innocent person may have been convicted" because the court is not "satisfied that competent, satisfactory, and sufficient evidence in th[e] record supports the jury's finding . . . [of] guilt[] beyond a reasonable doubt." *Sanchez*, 969 F.2d at 1414; *see also Archer*, 977 F.3d at 188 ("[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand.").

## II. DISCUSSION

### A. Thompson's Motion

#### 1. Count Three

Thompson contends that the evidence was insufficient to sustain his Count Three Hobbs Act robbery conviction because the Government presented no "direct, eyewitness testimony," and instead relied on Hytmiah's testimony and circumstantial evidence, including a bloody sweatshirt. (Thompson Mot. for J. of Acquittal ("Thompson Mot.") (Dkt. 659) at 2-3.) Because, Thompson argues, the Government did not present "direct, eyewitness testimony," it therefore failed to establish the essential Hobbs Act robbery element of actual or threatened force, violence, or fear of injury against the victim of the robbery. (*Id.* at 2.)

The Government argues in response that it in fact presented ample evidence proving the force or violence element. (Gov't. Opp'n. (Dkt. 665) at 20.) Specifically, the Government points to three pieces of evidence adduced at trial. First, it adduced Hytmiah's testimony describing a "scuffling" between Brandon Darby—a member of the robbery team—and the victim, which led to the victim being restrained. Second, Hytmiah testified that Darby was "soaked" in blood. And third, the jury saw the bloody sweatshirt that another robbery team member, Tyquan Henderson, was wearing just an hour after the robbery. Collectively, the Government argues, this circumstantial evidence renders Thompson's "contention that the victim's testimony was necessary in order to establish the use or threat of force . . . utterly meritless." (*Id.*) The court agrees.

As a threshold matter, the court finds Thompson's argument unavailing that circumstantial evidence is insufficient and only direct evidence suffices. The law makes no distinction between

direct and circumstantial evidence. *See, e.g.*, *United States v. Mac-Pherson*, 424 F.3d 183, 190 (2d Cir. 2005) ("[T]he law draws no distinction between direct and circumstantial evidence in requiring the government to carry its burden of proof."); *id.* ("The possibility that inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences."); *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) ("[T]he jury's verdict may be based entirely on circumstantial evidence."). Hytmiah's testimony, though circumstantial, could easily lead a rational trier of fact to find that actual violence against the robbery victim occurred. His testimony described more than a simple "scuffling." (Trial Tr. ("Tr.") at 189.) Hytmiah testified that Darby "was beating [the victim] up, assaulting [the victim]." (*Id.* at 190.) Combined with the evidence of Darby's blood-soaked clothing and Henderson's blood-stained sweatshirt, the jury was entitled to infer actual violence against the robbery victim without direct, eyewitness testimony. (*Id.* at 203; GX-302.) Furthermore, Thompson himself bolstered the jury's inference by conceding in his post-arrest statement that "somebody got f*cked up in there," and "the blood came from that fu**ing that [sic] robbery." (GX-600.) The jury was therefore entitled to find that the Government sufficiently established the element of actual or threatened force or violence by making reasonable inferences based solely on the Government's circumstantial evidence.

Moreover, setting aside Thompson's specific objection to the sufficiency of the evidence regarding the force or violence element, the court finds that the evidence adduced at trial was sufficient on all elements to sustain Thompson's Hobbs Act robbery conviction because any rational trier of fact could have found the essential elements beyond a reasonable doubt. *See Cassese*, 428 F.3d at 98. The court makes this determination by evaluating the

evidence in the light most favorable to the Government, mindful of Thompson's "very heavy burden." *Crowley* 318 F.3d at 407. The Government sought to prove its case under two theories—first casting Thompson as a substantive principal and second as an aider and abettor to the Hobbs Act robbery. Both find support in the record.

As to the evidence of Thompson acting as a substantive principal, a rational trier of fact could have inferred that Thompson unlawfully took personal property from another against his will by means of actual force to property. *See* 18 U.S.C. § 1951(a). First, by entering the stash house and stealing marijuana and a safe, a rational trier of fact could have found that Thompson unlawfully took personal property from another against his will. (Tr. 191-194.) Second, regarding the force or violence element, while the court doubts that there was sufficient evidence that Thompson used force or violence against a person—he entered the house after his confederates had already bloodied, beaten, and restrained the victim, (Tr. at 190-91)—this element may apply solely against property. *See United States v. Chappelle*, No. 20-3835, 2022 WL 2837807, at *5 (2d Cir. July 21, 2022) (holding that Hobbs Act robbery includes actual or threatened force, or violence, or fear of injury to *property alone*) (emphasis added); *United States v. Walker*, 314 F. Supp. 3d 400, 416 (E.D.N.Y. 2018) ("[Hobbs Act robbery] occurs regardless of whether the victim's will is overcome by force directed *to* a person *or* property."). Here, applying the force or violence element solely against property, the court finds there was sufficient evidence to sustain Thompson's guilt because he exercised force against the stolen safe. With Darby's help, Thompson uprooted the safe from the floor and lugged it to Hytmiah's car, necessarily using force against property in the process. (Tr. at 192-194.) Therefore, Thompson's actions satisfy the elements of Hobbs Act robbery, and there was sufficient evidence to sustain his conviction as a substantive principal.

Under an alternative aider and abettor theory, Thompson's direct role in assembling the robbery team and planning and executing the robbery even more easily sustains his conviction. To be liable under 18 U.S.C § 2 for aiding and abetting a crime, a defendant must "(1) take[] an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014). The various actions Thompson took to assemble, plan, and execute the robbery were each affirmative acts in furtherance of the robbery, and they clearly evince his intent to facilitate the robbery.

Thompson's role in planning the robbery began when Shamel Simpkins, an acquaintance who provided the initial tip about the stash house, connected Thompson and Hytmiah. (Tr. at 145-148; GX-300B at 14-15.) On the evening of September 6, 2017, Thompson and Hytmiah spoke over the phone and began planning the robbery that would take place in the early morning hours of September 7th. (Tr. at 147-149; GX-300B at 13 (logging an 8:51 PM FaceTime between Thompson and Hytmiah).) The two determined that Hytmiah would provide some members of the robbery team, with Thompson planning to bring his own men as well. (Tr. at 147; GX-600 at 6 (Thompson describing in post-arrest statement that "[Hytmiah] brings his own collection of people. I brung my collection of people.").) Thompson followed through with his plans and set about recruiting his crew. He called Elias, Henderson, and Lawrence Woods, all of whom eventually joined the team and helped execute the robbery. (GX-300B at 12-13; Tr. at 65.) Thompson, Elias, Henderson, and Woods then met Hytmiah and his crew at Hytmiah's aunt's house (the "Galway Residence") to hammer out the details of the robbery before driving to the stash house. (Tr. at 157, 159.) Thompson's role was to "go[] inside the house." (*Id.* at 155.)

Thompson fulfilled his role, helping to execute the robbery by entering the stash house and taking marijuana and a safe. (*Id.* at

191-194.) When Thompson entered the house he was on the phone with Hytmiah, so at trial Hytmiah was able to narrate Thompson's actions to the jury. (*Id.* at 191-92; GX-300B at 10-11.) First, Thompson found marijuana and dumped it into a black gym bag. (Tr. at 192.) Next, he happened upon a safe, which he uprooted from the floor with Darby's help and brought out to Hytmiah's car. (*Id.* at 192-194.) Thompson then returned to his car and left the scene. (*Id.* at 195, 580-82; GX-409 at 18-19.) The activity log in Thompson's phone corroborated Hytmiah's testimony that Thompson entered the stash house by showing when Thompson ascended and descended the flight of stairs leading up to the second-floor apartment where the stash house was located. (GX-300B at 2; Tr. at 724-26.)

This evidence of Thompson's key role in assembling the team and planning and executing the robbery provided sufficient evidence for the jury to find Thompson guilty beyond a reasonable doubt of aiding and abetting the robbery. He took numerous affirmative acts in furtherance of the robbery, at each stage evincing his intent to facilitate its commission. He held a preliminary planning call with Hytmiah, assembled a robbery team, attended a pre-robbery meeting, entered the stash house, and took marijuana and a safe from the house. The jury was entitled to credit each piece of evidence in reaching its verdict and finding Thompson guilty. This court will not now second-guess the jury's assessments. *See Rea*, 958 F.2d at 1222.

### 2. Count Four

Thompson claims there was insufficient evidence to sustain his conviction on Count Four of using or carrying a firearm during and in relation to the Hobbs Act robbery. He argues that the Government did not establish that he possessed or carried a firearm prior to or during the robbery, and that his presence in a vehicle in which a firearm was recovered after the robbery is likewise

insufficient to sustain conviction. (Thompson Mot. for J. of Acquittal at 2.)[2] He also contends that he did not aid and abet the crime because he did not facilitate the use of firearms. *Id.*

The Government did not make a substantive principal argument on this count, instead arguing only that Thompson is guilty because he aided and abetted the crime. (*See* Tr. at 1036; Gov't. Opp'n. at 25-27.) The Government presented evidence that Thompson facilitated the use of a firearm by helping to obtain a firearm that was used in the robbery. This evidence consisted of a Facebook Messenger conversation between Thompson and Henderson in which the two men discussed acquiring a firearm less than three hours before the robbery team met at the Galway Residence. Henderson messaged Thompson that Simpkins "gotta take us 2 get thos jackies," and Thompson replied, "I kno been on him." (GX-301A at 19.) The evidence showed that "jackie" meant firearm. (Tr. at 227.) Any rational trier of fact could reasonably infer that a firearm referenced in this conversation was used during the robbery given the temporal proximity of the conversation to the Galway Residence pre-robbery meeting, the evidence that Henderson eventually carried a gun during the robbery, and the evidence that there was a gun at the Woods residence post-robbery meeting of Thompson, Elias, Henderson, and Woods. (GX-504 at 3 ("I had the grip"); Tr. at 205 ("I seen a gun").) Accordingly, the jury was entitled to find that Thompson facilitated the use of a firearm by pressing Simpkins to provide one and communicating his efforts to Henderson.

---

[2] The court admitted evidence that Thompson possessed a firearm the night of the robbery after he denied having done so, but only for the purpose of "deciding whether to believe Latiff Thompson and how much weight to give to his testimony." (Tr. at 1137 (jury charge).) The court instructed the jury to consider this evidence only for that limited purpose. (*Id.*) In this motion, Thompson appears to misunderstand that the evidence was only admitted for this limited purpose, but the court nevertheless addresses the argument in the interest of completeness.

The Government argues that Thompson further facilitated the use of a firearm during and in relation to the Hobbs Act robbery by coordinating his armed confederates' travel to the Galway Residence and the stash house. Thompson found the driver, Elias, who transported Henderson and Woods, both armed, to each location. (Tr. at 162, 177.) At the Galway Residence, Hytmiah warned that there would be guns inside the stash house, and the robbery team would need to be prepared with guns of their own. (*Id.* at 162-63.) In response, Henderson and Woods lifted their sweatshirts to show everyone they were armed with black automatic pistols. (*Id.* at 162, 167.) This display established that Thompson had advance knowledge that his confederates were armed, and because he continued to participate in the robbery thereafter, the jury permissibly inferred Thompson's guilt. *See Rosemond*, 572 U.S. at 67, 78 n.9 (holding that to prove defendant guilty of § 924(c) offense by aiding and abetting, the Government must prove "that the defendant actively participated in the underlying . . . violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission" and explaining that "if a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such knowledge").

Thompson himself also confirmed that during the robbery his team used the guns that he helped obtain and which he saw displayed at the Galway Residence. In a recorded jail call, he discussed how Henderson felt he had not received his fair share of the loot, which made him "mad" because he was the one to carry the "grip" or "four fever," which the evidence showed meant gun. (GX-504; Tr. at 227, 740.) And in his post-arrest statement, Thompson explained that, in addition to a gun his team found in the stash house, there was also the gun they "went in there with." (GX-600 at 15.) Thus, taking into account the record evidence—including the Facebook conversation, Thompson's

role in coordinating his armed confederates' transportation, his advance knowledge that guns would be used during the robbery, and his recorded jail call and post-arrest statement—there was sufficient evidence for any rational trier of fact to find beyond a reasonable doubt that Thompson aided and abetted the unlawful use or carry of a firearm during and in relation to the Hobbs Act robbery.

Accordingly, Thompson's motions are DENIED.

### B.   Elias's Motion

#### 1.   Count Three

For his part, Elias contends that there was insufficient evidence to sustain his Hobbs Act robbery conviction and that much of the Government's evidence in fact demonstrates his innocence. He claims that he did not participate in the robbery and was not present when it occurred. (Elias Mot. for J. of Acquittal or New Trial ("Elias Mot.") (Dkt. 658) at 3.) He asserts that a recorded jail call in which he expressed regret for exposing himself to criminal liability by allowing an armed person into his car is actually exculpatory. (*Id.*; GX-501 at 2.) He contends that he never asked for a portion of the stolen proceeds, which evinces his innocence. (Elias Mot. at 3.) Further, he argues that Hytmiah provided such "incredible, manipulative and unreliable testimony" that the jury should not have believed his testimony linking Elias to the robbery, including his testimony about Elias's rental car. (*Id.* at 3-4.) Indeed, Elias argues that renting the car for a purpose unrelated to the robbery more than one week before it occurred demonstrates his innocence. (*Id.* at 3.) Last, he contends that the phone evidence was insufficient to support his conviction. Specifically, cell site data did not provide location information for Elias during the relevant time period and therefore could not place him at the robbery, and phone calls he made during the time of the robbery to people unassociated with the robbery are uncharacteristic of a robbery participant, he argues. (*Id.* at 4.)

The record evidence, however, also supports alternative inferences sufficient to sustain his conviction. *See* Fed R. Crim. P. 29. Nor is upholding his guilty verdict a manifest injustice, *see* Fed R. Crim. P. 33, because the court has no "real concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414. Because the evidence against Elias is strongest as an aider and abettor of the robbery, and the Government did not expressly argue Elias was a substantive principal, the court analyzes the sufficiency of the evidence against Elias only under an aider and abettor theory.

Contrary to his claim that he did not participate in the robbery, Elias played an instrumental role as the driver. (Tr. at 155.) By carrying out this role, Elias took affirmative acts in furtherance of the robbery that indicated he intended to facilitate the robbery's commission. *See Rosemond*, 572 U.S. at 71. His affirmative acts as the driver included ferrying Thompson, Henderson, and Woods to the Galway Residence for the pre-robbery meeting, then to the stash house to execute the job. (Tr. at 159, 174-75.) After the robbery, he was Thompson's getaway man, piloting him back to the Galway Residence. (GX-409 at 18-19; Tr. at 580-84.) And when Hytmiah raced to Woods's residence upon discovering that Henderson and Woods had brought the marijuana there after leaving the stash house, Elias followed close behind, with Thompson his passenger. (Tr. at 201-02, 424-25.) Last, after rendezvousing and agreeing to return to the Galway Residence, Elias drove Thompson, Henderson (in a still-bloody sweatshirt (GX-302)), and Woods toward that house—only to be pulled over and arrested by NYPD just one hour after the robbery. (Tr. at 439, 731, 733.) Each of these steps was an affirmative act in furtherance of the robbery, *see Rosemond*, 572 U.S. at 71, and contradicts Elias's claim that he did not participate. (Elias Mot. at 3.) Elias was an instrumental member of the robbery team— without him, his confederates would not have traveled to the pre-

13

robbery meeting, the stash house, or the various getaway locations. Although Elias claims he was a dollar cab driver wholly unaware of his role in the robbery (Tr. at 803-806), the evidence adduced at trial entitled the jury to draw a different conclusion: that he was well aware of and fully intended to facilitate the commission of the robbery. *See Rosemond*, 572 U.S. at 71.

Various evidence corroborates Elias's role as the driver. First, Hytmiah explained this was Elias's role and described how Elias ferried half the robbery team to the Galway Residence and then to the stash house. (Tr. at 155, 159, 174-75.) Elias asserts that Hytmiah was "incredible, manipulative and unreliable," (Elias Mot. at 4), but these assertions fail under both Rule 29 and Rule 33. When assessing a Rule 29 Motion for Acquittal, "the credibility of witnesses . . . [is] within the province of the jury," *Rea*, 958 F.2d at 1221-22, and the court must "resolve all issues of credibility in the government's favor." *Canady*, 126 F.3d at 356. Likewise, on a Rule 33 motion, "courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility," *Ferguson*, 246 F.3d at 133, unless Hytmiah's testimony was "patently incredible," *Landesman*, 17 F.4th at 331, which it was not, or "defied physical realities," *id.*, which it did not. Nor did "the government's case depend[] upon strained inferences drawn from uncorroborated testimony." *Id.* Accordingly, the jury appropriately credited Hytmiah's testimony establishing Elias as a key participant in the robbery. At this late stage, the court is "not entitled to second-guess the jury's assessments." *Rea*, 958 F.2d at 1221-22.

Second, New York Police Department Lieutenant Javier Rodriguez's testimony provided further evidence of Elias's role as the driver, and Rodriguez's description of Elias's car corroborated Hytmiah's testimony. Rodriguez observed a vehicle matching Hytmiah's description of Elias's car—a silver Nissan Altima with rental plates—speed to Woods's residence. (Tr. at 424-25, 432-

14

433.) Hytmiah had described Elias's car as a white or gray rental, so the jury was entitled to infer that the car belonged to Elias and that he was driving it. (*Id.* at 155-56.) Elias's argument that renting the car a week prior to the robbery for reasons unrelated to the robbery demonstrates his innocence falls flat because "the relevance of the rental vehicle was its description, color ('white or gray'), appearance (a rental), and driver (the car was rented in Elias's name)." Gov't. Opp'n. at 23. Rodriguez further testified that he saw Elias's and Hytmiah's cars arrive at the Woods residence, then people mingling outside the cars, and 15 minutes later, the people disappearing as the cars departed the scene. (Tr. at 426-28.) The jury was entitled to infer these people were members of the robbery crew that Elias was driving back toward the Galway Residence. As they returned, Rodriguez observed Elias and Hytmiah speed past him, and he placed the radio call that led to the arrests of Elias, Thompson, Henderson, and Woods. (*Id.* at 428, 436-37.) Considering this second set of corroborative evidence from Rodriguez that Elias was the driver, the totality of the evidence was thus sufficient to allow any rational trier of fact to find Elias guilty beyond a reasonable doubt of aiding and abetting the robbery by acting as the driver. *See Cassese*, 428 F.3d at 98.

Additional evidence that Elias argues is exculpatory does not disturb the jury's verdict. Whatever Elias's arguments, the court must now construe the evidence "in the light most favorable to the Government, with all reasonable inferences drawn in favor of the verdict." *Crowley*, 318 F.3d at 407. In this posture, the evidence is clearly sufficient to meet Rule 29's more stringent standard that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Cassese*, 428 F.3d at 98. While Elias argues that the jail call in which he expressed regret for exposing himself to criminal liability by allowing an armed person into his car shows his innocence, any rational trier of fact could easily find otherwise: that Elias

was aware of his role in aiding and abetting the robbery and only in hindsight and while incarcerated regretted his intent to facilitate its commission. (GX-501T.) As to his claim that he never sought a share of the stolen proceeds, the evidence supported an alternative conclusion. In another jail call, Elias inquired whether "ni**as still dead." (GX-513 at 3.) Detective Adam Georg explained that to be "dead" is to be cut off, and Hytmiah explained it means "I'm not dealing which [sic] you no more" and "you don't get nothing." (Tr. at 150, 741.) The jury was entitled to draw an inference opposite Elias's that he was indeed seeking his share of the proceeds by inquiring whether he was dead, or cut off from Hytmiah. As to Elias's argument that the phone evidence, including cell site location information and phone call logs, was insufficient to sustain conviction, any rational trier of fact could have conversely found that it was sufficient. The jury was entitled to infer that cell site location information corroborating Thompson's location and movements, (*see, e.g*, GX-409 at 19 (showing Thompson's movement from Galway Residence toward Woods's residence)), was similarly corroborative of Elias's whereabouts because the two men drove together. And the jury could have reasonably disagreed with Elias's argument that calling non-robbery-participants during the robbery is uncharacteristic of a guilty man; he was, after all, waiting around for his confederates in a car outside.

Accordingly, the court finds that the evidence was sufficient to sustain Elias's Hobbs Act robbery conviction, and the interest of justice does not require that he be granted a new trial.

### 2. Count Four

Elias next claims there was insufficient evidence to sustain his conviction on Count Four of using or carrying a firearm during and in relation to a Hobbs Act robbery. He argues that Hytmiah's testimony—which placed him at a pre-robbery meeting where firearms were present, in the car driving armed confederates to

the stash house, and at a post-robbery meeting where firearms were again present—was "unreliable and incredulous [sic]." (Elias Mot. at 4.) He also claims there was no evidence proving that he knew a firearm would be used in connection with a robbery. (*Id.* at 5.) Both arguments are unavailing.

As with Thompson, the Government argued on Count Four that Elias was guilty only as an aider and abettor, so the court proceeds with its analysis accordingly. (*See* Tr. at 1036; Gov't. Opp'n. at 25-27.) Evaluating the affirmative act and intent requirements of aiding and abetting liability, *see Rosemond,* 572 U.S. at 71, the court finds that Hytmiah's testimony established sufficient evidence of Elias's affirmative acts, and Elias's knowledge that his confederates would use or carry firearms during and in relation to the robbery established sufficient evidence of his intent.

The affirmative acts Elias undertook in furtherance of the robbery were driving armed confederates to a pre-robbery meeting and then driving them to the robbery itself. (Tr. at 159, 174-75.) Hytmiah explained to the jury that Elias performed these acts, and Elias's attacks on Hytmiah's credibility fall flat for the same reasons discussed above: Hytmiah's credibility was for the jury to determine, and the jury's guilty verdict necessitates that the court credit Hytmiah's account. The jury was entitled to infer from Hytmiah's testimony Elias's role in facilitating the use and carrying of firearms by driving armed confederates in furtherance of the robbery.

As to the second aiding and abetting element, Elias's knowledge that his confederates would use or carry firearms during and in relation to the robbery established his intent to facilitate the commission of that crime. Analyzing aiding and abetting liability for a § 924(c) offense, the Supreme Court has explained that

> the unarmed driver of a getaway car ha[s] the requisite intent to aid and abet armed bank robbery if he 'knew' that his confederates would use weapons in carrying out

17

> the crime. . . . So for purposes of aiding and abetting
> law, a person who actively participates in a criminal
> scheme knowing its extent and character intends that
> scheme's commission.

*Rosemond,* 572 U.S. at 77. Elias, the unarmed getaway driver for
a stash house robbery, knew his armed confederates—Hender-
son and Woods—would use weapons to carry out the robbery.
He drove Henderson and Woods to the Galway Residence for a
pre-robbery meeting where Hytmiah warned that because there
would be guns inside the stash house, the robbery team would
need to be prepared with guns of their own. (Tr. at 159, 162-63.)
As with Thompson, when Henderson and Woods lifted their
sweatshirts to show everyone they were armed with black auto-
matic pistols, their display sufficed for a jury to infer that Elias
knew his confederates were armed. (*Id.* at 162, 167.) Evaluating
the display in the context of Hytmiah's warnings, the jury could
infer that Elias knew the robbery's extent and character: that
Henderson and Woods intended to use or carry their firearms to
effectuate the robbery. Because Elias knew the robbery's extent
and character and actively participated in it by driving his armed
confederates to the Galway residence and the stash house, the
jury could infer that he intended the robbery's commission. (*Id.*
at 159, 174-75); *see also Rosemond,* 572 U.S. at 77. This evidence
is sufficient to sustain Elias's conviction.

Moreover, one of Elias's recorded jail calls provided *ex-post* cor-
roboration of his knowledge. Elias argues that call, in which he
expressed regret for exposing himself to criminal liability by al-
lowing an armed person into his car, was not inculpatory but
merely showed his frustration at being incarcerated for crimes in
which he played no role. (GX-501T at 2; Elias Mot. at 5.) But the
jury was entitled to draw a contrary inference and find that Elias's
call demonstrated that he controlled who and what entered his
car. As a result, it stands to reason that Elias would have known

his confederate was armed, and that he permitted the confederate inside his car because he intended to facilitate the use or carrying of a firearm during and in relation to the Hobbs Act robbery. Thus, the court finds that the evidence was sufficient to sustain Elias's conviction of using or carrying a firearm during and in relation to a Hobbs Act robbery, and the interest of justice does not require that he be granted a new trial. His motions are both accordingly DENIED.

## III. CONCLUSION

For the reasons set forth above, Defendants' Rule 29 motions and Elias's Rule 33 motion are DENIED.

SO ORDERED.


Dated:     Brooklyn, New York
           August 5, 2022

                              s/Nicholas G. Garaufis

                              NICHOLAS G. GARAUFIS
                              United States District Judge

19